AO 93 (Rev. 11/13) Search and Seizure Warrant  (USAO CDCA Rev. 04/17)

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.   8:19-MJ-00942-DUTY |
| The premises located at: 28291 Via Luis Laguna Niguel, California 92677 | ) ) ) | |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Central _____ District of _____ California _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

Such affidavit(s) or testimony are incorporated herein by reference and attached hereto.

**YOU ARE COMMANDED** to execute this warrant on or before     14 days from the date of its issuance *(not to exceed 14 days)*

☒ in the daytime 6:00 a.m. to 10:00 p.m.     ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to     the U.S. Magistrate Judge on duty at the time of the return through a filing with the Clerk's Office .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:     December 16, 2019 at 1:20 p.m.     *Karen E. Scott*
                                                                                                         *Judge's signature*

City and state:     Santa Ana, California     Honorable Karen E. Scott, United States Magistrate Judge
                                                                                    *Printed name and title*

AUSA: J. Nare (x3549)

Case 8:19-mj-00942-DUTY *SEALED*   Document 1-1 *SEALED*   Filed 12/16/19   Page 2 of 47
Page ID #:48

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>8:19-MJ-00942-DUTY | Date and time warrant executed:<br>12/17/2019 APPROX. 0700 HRS . | Copy of warrant and inventory left with:<br>Sina Beheshtaein and Setareh Beheshtaein |

Inventory made in the presence of :
HSI SA Olga Sagalovich and  HSI SA Scott Wittmier

Inventory of the property taken and name of any person(s) seized:

- Approximately 40 Boxes and 1 Bag of alleged counterfeit
bearings, to include: Nachi , Koyo , NTN , Timken , NSK and
SKF bearings and automotive parts, labels and boxes
(NGK, Toyota , Mercedes Benz , BMW, Nissan, Ford , AC Delco
and Honda ).
- Misc. Documents ( 2 Bags)
- Dell Inspiron laptop ( 1 Each)
- Dell Vostro 1520 laptop ( 1 Each)
- Apple iPhone X ( 1 Each)
- Samsung Galaxy A20 ( 1 Each)
- LG K30 ( 1 Each)

Nothing Further

| Certification |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: 12 | 18 | 2019

_____
*Executing officer's signature*

Olga Sagalovich , Special Agent - HSI
*Printed name and title*

## AFFIDAVIT

I, Olga Sagalovich, being duly sworn, hereby state and declare as follows:

### I.   INTRODUCTION

1.   I am a Special Agent ("SA") with the Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), presently assigned to the Office of the Assistant Special Agent in Charge, Orange County.  I have been employed with DHS since September of 2004.  As part of my duties, I investigate violations of criminal law relating to the illegal importation of contraband, including counterfeit goods, intellectual property rights violations, and commercial fraud.  I am currently assigned to the Global Trade Investigations group within the HSI Orange County office.  During my assignment to this group, I have investigated and assisted other agents in investigating numerous cases involving violations regarding fraud and intellectual property rights.  As part of my employment, I have received training at the Criminal Investigator Training Program ("CITP") and ICE Special Agent Training ("ICE SAT") at the Federal Law Enforcement Training Center ("FLETC") located in Glynco, Georgia.  Moreover, as a federal law enforcement agent engaged in enforcing federal law, I am authorized by law to request a search warrant.

### II.  PURPOSE OF AFFIDAVIT

2.   This affidavit is made in support of an application for a search warrant for the residence of Sina BEHESHTAEIN

1

located at 28291 Via Luis, Laguna Niguel, California 92677 (the "SUBJECT PREMISES"), as described in Attachment A, for evidence of violations of 18 U.S.C. § 2320 (Trafficking in Counterfeit Goods); 18 U.S.C. § 545 (Smuggling Goods into the United States); 18 U.S.C. § 1341 (Mail Fraud); and 18 U.S.C. § 1343 (Wire Fraud) (the "Subject Offenses"), as described in Attachment B.

    3.   The information contained in this affidavit is based on my personal observations, witness interviews, conversations with investigators and agents of HSI and other agencies involved in this investigation, and a review of documents obtained during this investigation.  This affidavit does not purport to set forth all of my knowledge of, or investigation into, this matter.  Where conversations and events are referred to herein, they are related in substance and in part.  I have set forth only those facts that I believe are necessary to establish probable cause for the warrant requested herein.

### III. <u>BACKGROUND OF THE INVESTIGATION</u>

    4.   The HSI Orange County office is investigating a counterfeit automotive parts scheme run by Sina BEHESHTAEIN and Setareh BEHESHTAEIN, who sell counterfeit automotive parts as Original Equipment Manufacturer ("OEM") automotive parts to consumers on eBay and PayPal.  In doing so, Sina BEHESHTAEIN and Setareh BEHESHTAEIN infringe the trademarks of automakers, such as Toyota and Honda, and sell a substandard part to their customers.

2

5.    Based on my training and experience, I know the following about OEM automotive parts:

a.    OEM automotive parts are produced by the original producer of a vehicle's components.  OEM parts could be made by several different companies, who then provide the parts to a vehicle manufacturer to install into the production of a vehicle.

b.    OEM parts are made specifically for a certain product, such as Honda or Toyota, and are high quality products.

c.    Replacing damaged parts with OEM parts ensures a higher consistent quality product designed to be fully compatible for the vehicle in which it is intended for.

d.    Aftermarket products are designed to be fully functional, but they are not produced in the same consistent quality manner as OEM parts, thereby making them a cheaper alternative for consumers.

e.    End users choose OEM parts because they know the craftsmanship and quality of the product will work as intended for their vehicle, and they therefore pay a premium price for the product.

## IV.   <u>STATEMENT OF PROBABLE CAUSE</u>

6.    In June 2019, HSI SA Scott Wittmier advised me that he received information from HSI's National Intellectual Property Rights Coordination Center ("NIPRCC") that Sina BEHESHTAEIN of is possibly engaged in dealing counterfeit automotive parts utilizing the eBay internet platform.  These automotive parts

3

are being marketed and sold as OEM parts via www.ebay.com under the seller identification of "405parts."

a.   HSI's NIPRCC provided SA Wittmier with eBay's registration information for the eBay user "405parts."  I reviewed the registration information and saw that Sina BEHESHTAEIN's name was listed as the registrant for the eBay user "405parts."  Sina BEHESHTAEIN registered with eBay on March 22, 2010 and his listed address was 22332 Caminito Tecate, Laguna Hills, California 92653.

b.   HSI's NIPRCC also provided SA Wittmier with information for seizures that were linked to Sina BEHESHTAEIN. I reviewed the seizure information and learned the following:

i.   On February 8, 2016, U.S. Customs and Border Protection ("CBP") seized, under Incident Report Number 2016SZ004182701, approximately 210 counterfeit SKF ball bearings that were destined for Sina BEHESHTAEIN at 22332 Caminito Tecate, Laguna Hills, California 92653 ("February 8, 2016 Seizure").

ii.   On May 6, 2019, CBP seized, under Incident Report Number 2019SZ0078135, approximately 500 counterfeit Toyota, Honda, and Nissan spark plugs that were destined for Sina BEHESHTAEIN at 3700 Parkview Lane, Apartment 13C, Irvine, California 92612 ("May 6, 2019 Seizure").  CBP Import Specialist ("IS") Robert Bannister from CBP's Center of Excellence and Expertise, Automotive and Aerospace, determined that the spark plugs were counterfeit based on the low value of the merchandise, the poor quality of the packaging materials and the

4

fact that genuine merchandise would not be shipped to a residential address.

7.    On June 27, 2019, I contacted Fines, Penalties, and Forfeitures ("FP&F") Paralegal Specialist ("PS") Anthony Banks regarding the February 8, 2016 seizure.  PS Banks advised me that Sina BEHESHTAEIN responded to the Notice of Seizure and Information to Claimants Non-CAFRA Form ("Notice of Seizure") that was sent to him by CBP, and he elected option number 2, in which Sina BEHESHTAEIN requested that CBP consider his "Offer in Compromise"[1] administratively before forfeiture proceedings are initiated.  Sina BEHESHTAEIN's "Offer in Compromise" totaled $100.00.  PS Banks noted that he recalled speaking to Sina BEHESHTAEIN and that Sina BEHESHTAEIN indicated that he was a college student and that the bearings (seized counterfeit automotive parts) were to be used for his school thesis.  PS Banks further noted that Sina BEHESHTAEIN's "Offer in Compromise" was ultimately denied by CBP and his money was refunded.

    a.    I reviewed the Notice of Seizure and observed that it was sent to Sina BEHESHTAEIN at 22332 Caminito Tecate, Laguna Hills, California 92653 on February 17, 2016.  The Notice of Seizure affirmed that CBP seized 210 counterfeit SKF Ball

---

[1] An "Offer in Compromise" is a request that CBP agree to keep less than the full value of the property in exchange for avoiding the expenses of defending a challenge to the forfeiture (either administratively or in court) and the risks that the challenge will be successful.

Bearings at the DHL Express Consignment Carrier Facility in Los Angeles, California.

      b.   I reviewed the Appraisal Form, sent by CBP IS Nora Lum, regarding the authenticity determination of the 210 counterfeit SKF Ball Bearings and learned that the trademark holder, SKF USA Inc., determined that the ball bearings were counterfeit due to the incorrect information on the package, incorrect packaging, incorrect country of origin, and incorrect information on the product.

      c.   I also reviewed the FP&F Case Payment Sheet containing the copy of Sina BEHESHTAEIN's check that was sent as an "Offer in Compromise." The name and address on the JPMorgan Chase Bank, N.A. check was "Sina Beheshtaein, 22332 Caminito Tecate, Laguna Hills, CA 92653" (account number ending in 6399). The check was dated March 1, 2016, in the amount of $100.00 and CBP was listed in the "Pay to the Order of" line. In the memo line of the check, case number 2016279100025501 was listed. The check was signed by "Sina Beheshtaein."

      8.   On July 1, 2019, I received information from FP&F PS Tanya Tedeschi regarding the May 6, 2019 Seizure. PS Tedeschi advised me that the Notice of Seizure was mailed on June 10, 2019 to Sina BEHESHTAEIN at 3700 Parkview Lane, Apartment 13C, Irvine, California 92612. PS Tedeschi further advised me that the Notice of Seizure was sent certified, return receipt requested. PS Tedeschi noted that the return receipt had not been received yet. PS Tedeschi further noted that no response had been received from the violator (Sina BEHESHTAEIN).

     a.   I reviewed the Notice of Seizure and observed that it was sent to Sina BEHESHTAEIN at 3700 Parkview Lane, Apartment 13C, Irvine, California 92612 on June 10, 2019.  The Notice of Seizure affirmed that CBP seized 500 counterfeit Toyota, Honda, and Nissan spark plugs at the DHL HUB in Los Angeles, California.

     b.   On October 7, 2019, I received an update from PS Tedeschi regarding the May 6, 2019 Seizure.  PS Tedeschi advised me that the Notice of Seizure was returned to FP&F on July 1, 2019 with "Attempted-Not Known; Unable to Forward" as the reason for the return.  PS Tedeschi further advised me that FP&F resent the Notice of Seizure on July 17, 2019 via regular mail and the Notice of Seizure had not been returned.  PS Tedeschi noted that no response had been received from the violator (Sina BEHESHTAEIN).

9.   On July 8, 2019, I conducted database queries in DHS indices to gather information pertaining to the previous cargo importations/shipments into the United States from abroad destined for three different addresses linked to Sina BEHESHTAEIN located in Orange County, California.  The record checks revealed the following:

     a.   Approximately 34 shipments inbound from abroad to 22332 Caminito Tecate, Laguna Hills, California 92653 during the date range of May 31, 2015 to June 25, 2016.  The 34 shipments were addressed to consignee – Sina BEHESHTAEIN, and all, but one shipment arrived from Hong Kong or China.

7

b.     Approximately 180 shipments inbound from abroad to 3700 Parkview Lane, Apartment 13C, Irvine, California 92612 during the date range of April 27, 2017 to April 18, 2019.  The 180 shipments were addressed to either Sina BEHESHTAEIN, Sima RAZAVI, or "Sina," and arrived from Hong Kong or China.  Record checks in federal indices revealed that Sima Razavi is Sina BEHESHTAEIN's mother.

c.     Approximately 21 shipments inbound from abroad to the SUBJECT PREMISES between the time range of May 18, 2019 to July 8, 2019.  The 21 shipments were addressed to either a consignee named "Sina" or Sima Razavi and arrived from Hong Kong or China.  I conducted record checks on the SUBJECT PREMISES in a commercial database called CLEAR and learned that Sina BEHESHTAEIN is the owner of this property.  Sina BEHESHTAEIN purchased this property (a residential condominium) in April 2019 for the amount of $557,000.00.

d.     On October 24, 2019, I again conducted database queries in DHS indices to gather additional information regarding the previous cargo importation/shipments into the United States from abroad destined for the SUBJECT PREMISES. The record checks revealed that approximately 68 shipments arrived to this address from either South Korea, China, or Hong Kong between the date range of May 18, 2019 to October 23, 2019. The 68 shipments were addressed to the following consignee names: "Sina"; Sina BEHESHTAEIN; Sima RAZAVI; World Capital LLC; Panda Logistics USA, Inc.; or Lanjing Department Store Co. Ltd.

e.    I conducted an Internet based search of a website for the California Secretary of State, Business Programs (https://businesssearch.sos.ca.gov/) regarding World Capital LLC.  The business search revealed that Sina BEHESHTAEIN at the SUBJECT PREMISES listed himself as the "CEO" for World Capital LLC.  The status for the business was listed as active and the type of business for World Capital LLC was listed as "online sales and investment."

10.    Based on my training and experience, my knowledge of this case, and other counterfeit automotive parts investigations, I know that counterfeit automotive parts are often manufactured in China or Hong Kong and sent to the United States.  SA Wittmier advised me that from his conversations with trademark rights holders it is suspected that counterfeiters are now transshipping their counterfeit merchandise from South Korea to avoid paying additional duties/tariffs.

11.    On July 15, 2019, I received information from PayPal Holdings, Inc. Global Investigations Team ("PayPal") pertaining to Sina BEHESHTAEIN's PayPal account information.  I reviewed the information and learned that Sina BEHESHTAEIN had 12 PayPal accounts, one of those accounts was an open PayPal account, number 1522685529129626030 that was created on February 16, 2013, with the business name of "405 engineering" and an email address of s_beheshtaein@yahoo.com.

a.    This PayPal account had the following two addresses listed as the most recent home or work addresses: P.O.

9

Box 2223, Mission Viejo, California 92690[2] and the SUBJECT
PREMISES.

      b.   This PayPal account had a listed total amount
received of $439,062.19 (United States dollars) and a listed
total amount sent of $267,742.54 (United States dollars).

      c.   I reviewed the payments received to this PayPal
account.  There were approximately 13,213 payments received
ranging from July 1, 2017 to July 2, 2019.  Most of these
payments were from eBay for automotive parts and almost all
under the e-mail address of s_beheshtaein@yahoo.com.

   12.  On August 15, 2019, I received and reviewed updated
information from the PayPal account referenced above, number
1522685529129626030, associated to Sina BEHESHTAEIN's e-mail
address of s_beheshtaein@yahoo.com.

      a.   I reviewed the payments received for this PayPal
account.  At this time, there were approximately 13,656 payments
received between August 1, 2017 to August 4, 2019, indicating
that there were over four hundred additional payments received
to the account over an approximate one-month period.  Most of
these payments were from eBay for automotive parts.

---

[2] In July 2019, I reviewed the Application for Post Office Box
Service for P.O. Box 2223, Mission Viejo, California 92690 and
observed that Sina BEHESHTAEIN was listed as the person applying
for the P.O. Box.  Sina BEHESHTAEIN listed his driver's license
(number ****0060) as one form of valid identification for
himself in order to rent the P.O. Box; a copy of Sina
BEHESHTAEIN's California driver's license (number ****0060) was
maintained with his application at the San Juan Capistrano Post
Office.

      b.    Sina BEHESHTAEIN's active bank account for this PayPal account was listed as JPMorgan Chase Bank, N.A. ("Chase Bank"), under account number 889936399.

    13.   On September 16, 2019, I reviewed information received from JPMorgan Chase Bank, N.A. ("Chase Bank") pertaining to Sina BEHESHTAEIN's Chase Bank account number ending in 6399 and learned the following:

      a.    Sina BEHESHTAEIN opened this account on March 17, 2010.

      b.    SA Wittmier conducted financial analysis on this Chase Bank account and advised me that from January 2, 2018 to August 13, 2019, there was approximately $297,826.91 deposited into this account from PayPal.

    14.   On July 11, 2019, I conducted a query on the seller identification name of "405parts" in eBay's website (https://www.ebay.com/usr/405parts) and learned the following:

      a.    I observed 350 items for sale under the seller identification name of "405parts."  The eBay store name for the seller "405parts" was listed as "405Part Exchange."

      b.    The seller had 2,273 positive, six neutral, and four negative feedback comments/ratings.  Based on my training and experience, I know that sellers typically obtain feedback from purchasers of items on eBay following the sale of an item.

      c.    The eBay seller "405parts" was listed as an eBay member since March 22, 2010 and had 106 "Followers."

      d.    The 350 listed items for sale were all automotive parts and included some of the following products:

- "6 pcs NGK IZFR6K11 6994 spark plugs Laser Iridium OEM Honda Accord Acura TL/RL";

- "4 pcs NGK BKR5EIX-11 5464 Plug Spark Plugs new OEM Iridium IX spark plugs new";

- "1 pcs 16604-0P011 / 16604-31020 GENUINE TOYOTA / LEXUS DRIVE BELT IDLER PULLEY";

- "4 pcs Denso SK20R11 90919-01210 Genuine 3297 Toyota Lexus spark plugs OEM new";

- "1 pcs 6204-2RSH SKF new Brand rubber seals ball bearing 6204-2RSH Made in France"; and

- "1 pcs NSK 6206DDUM Ball Bearing 6206DDUM sealed free shipping new".

15.   On July 11, 2019, SA Wittmier and I conducted an undercover buy of the following automotive parts from Sina BEHESHTAEIN's eBay store "405Part Exchange" (eBay seller identification: "405parts"):

- "1 pcs Timken Set 14, L44643/L44610 Cup & Cone Set free shipping OEM New (182889540197)" (quantity: 1 / item price: $9.49);

- "6 pcs NGK IZFR6K11 6994 spark plugs Laser Iridium OEM Honda Accord Acura TL/RL (183274771839)" (quantity: 1 / item price: $31.99);

- "4 pcs NISSAN PLFR5A-11 22401-5M015 laser Iridium spark plugs NGK 6240 OEM new (182754579430)" (quantity: 1 / item price: $19.48);

- "1 pcs 16604-0P011 / 16604-31020 GENUINE TOYOTA / LEXUS DRIVE BELT IDLER PULLEY (183758044979)" (quantity: 1 / item price: $22.90);

- "4 pcs TOYOTA 90919-01233 DENSO 3417 spark plug SK16HR11 iridium long life OEM (183080965874)" (quantity: 1 / item price: $19.85);

- "1 pcs 6204-2RSH SKF new Brand rubber seals ball bearing 6204-2RSH Made in France (182800858345)" (quantity: 1 / item price: $6.30); and

- "2 pcs SKF 7207CD/P4A Abec 7 Super Precision Spindle Bearings new Two new (183445406072)" (quantity: 1 / item price: $114.06).

16.   On July 16, 2019, SA Wittmier and I took custody of a package from a mailbox, utilized in an undercover capacity, located in the city of Santa Ana, California.  The shipping label on the box listed the shipper information as follows: "WORLD CAPITAL, PO BOX 2223, MISSION VIEJO CA 92690-0223."

17.   On July 17, 2019, SA Wittmier and I conducted an inventory of the contents of the package and confirmed that the package contained all the items that were ordered from eBay seller "405parts" on July 11, 2019.  After opening the box, SA Wittmier and I observed the various automotive parts that were purchased under crumpled paper that was being used for packaging.  The box did not contain an invoice/packing slip of the items that were purchased from eBay seller "405parts" on July 11, 2019.

13

18.   On July 17, 2019 and July 18, 2019, SA Wittmier sent,
via e-mails, photographs taken of the automotive parts purchased
from eBay seller "405parts" to the various trademark rights
holders of the automotive parts, including NGK Spark Plugs
(USA), Inc., Toyota Motor North America, SKF USA, Inc., Nissan
Group of North America, and The Timken Company, for
determination regarding whether the automotive parts were
genuine or counterfeit.  SA Wittmier also sent sample automotive
parts to some trademark rights holders to be used in their
analysis.  The following details the responses received from the
trademark rights holders:

a.   On July 18, 2019, SKF USA, Inc. concluded that,
based on the available photographs of the products that were
sent to them, the products with designations 7207 CD/P4A and
6204-2RSH were counterfeit.  On November 6, 2019, SKF provided
me with a Verification Report pertaining to their analysis of
the products with designations 7207 CD/P4A and 6204-2RSH.  SKF
determined that these bearings were counterfeit based on
incorrect information and markings on the bearings and packaging
compared with a genuine SKF bearing.

b.   On July 26, 2019, Nissan Group of North America
notified me and SA Wittmier that the Nissan spark plugs (part
number 22401-5M015) were counterfeit.  Nissan determined that
the sample spark plugs were counterfeit based on the differences
in package color, size, and the printing on the package for the
sample spark plug versus a genuine OEM Nissan spark plug with

14

the same part number.  Nissan also determined that the thread
quality was below OEM specifications on the sample unit.

      c.   On August 8, 2019, NGK notified SA Wittmier and
me that the NGK spark plugs (part number IZFR6K11) were
counterfeit.  NGK determined this due to features on the spark
plugs, including the shape of the ground and center electrode,
the surface of the insulator and the crimping of the gasket.

      d.   On July 24, 2019, Toyota Brand Protection
notified SA Wittmier and me that the Toyota Pulley (part number
16604-31020) was counterfeit.  To determine this, Toyota
reviewed the photographs of the part and advised that this part
number was discontinued in 2011.  Toyota also noted that the
font/thickness of the "TOYOTA" logo on the part number label was
too thick.  Additionally, Toyota advised that similar genuine
parts have the country of origin stamped on the rubber seal and
the suspect product in the photographs did not appear to have
that stamping.

      e.   On July 25, 2019, The Timken Company notified SA
Wittmier and me that the Timken Tapered Roller Bearings (part
number L44643/10) were counterfeit.  To determine this, The
Timken Company reviewed the photographs provided to them by SA
Wittmier and determined that the packaging did not conform to
Timken's specifications in terms of printing standards and
identification information and the product itself contains
markings that do not align with the plan of production for such
Timken product.

    f.    On August 20, 2019, Toyota Brand Protection notified SA Wittmier and me that they received feedback from Denso confirming Toyota's original opinion that the Toyota spark plugs (part number 90919-01233) were counterfeit.  Toyota advised that Denso in Japan reviewed the photographs provided by SA Wittmier and determined that the spark plugs were counterfeit because they contained improper welding method used for the center electrode and the shape of the housing shoulder was incorrect.

    19.  On July 13, 2019, I received information from eBay pertaining to the eBay user "405parts."  On July 19, 2019, I learned the following:

    a.    The account was registered on March 22, 2010 to Sina BEHESHTAEIN at 22332 Caminito Tecate, Laguna Hills, California 92653;

    b.    The shipping address for Sina BEHESHTAEIN's eBay account was listed as World Capital, P.O. Box 2223, Mission Viejo, California 92690;

    c.    The SUBJECT PREMISES was listed as the most recent address in the Shipping Address History[3] section of eBay's report;

    d.    eBay information included a list of "All Items Listed with Buyers" for eBay seller "405parts" ranging from July 21, 2018 to July 4, 2019.  The list included approximately 2,635

---

[3] The Shipping Address History section contains the historical shipping addresses for the account, meaning if the account purchased an item this was an address used as the ship to address.

items, all of which were automotive parts that were listed for sale by eBay seller "405parts";

      e.   eBay information also included a list of "Account Complaints" for eBay user identification "405parts" ranging from July 31, 2018 to June 28, 2019.  The list included 40 "Account Complaints," all of which were associated to automotive parts.

   20.  On July 13, 2019, I also received information from eBay pertaining to eBay user identification "parts325."  On July 19, 2019, I learned the following:

      a.   The account was registered on May 12, 2016;

      b.   The registered name was listed as "Set Beht" at 3600 Parkview Lane, Irvine, California 92612 and the e-mail address was listed as setarebeheshtaein@yahoo.com;

      c.   The shipping address for this eBay account was listed as World Capital, P.O. Box 2223, Mission Viejo, California 92690;

      d.   The SUBJECT PREMISES, with Sina BEHESHTAEIN's name, was listed as the most recent address in the Shipping Address History section of eBay's report;

      e.   The "Contact Information History" section of eBay's report listed World Capital, P.O. Box 2223, Mission Viejo, California 92690, 323-423-4752, as the most recent contact information;

      f.   The contact information that was listed prior to World Capital was Setareh BEHESHTAEIN, 3600 Parkview Lane, Irvine, California 92612, 949-662-7191.

g.   eBay information included a list of "All Items
Listed with Buyers" for eBay seller "parts325" ranging from
August 28, 2018 to July 4, 2019.  The list included
approximately 261 items and all, but one of the 261 items were
automotive parts that were listed for sale by eBay seller
"parts325";

h.   eBay information also included a list of "Account
Complaints" for eBay user "parts325" ranging from October 19,
2018 to June 16, 2019.  The list included seven "Account
Complaints" all of which were associated to automotive parts.

21.   On July 18, 2019, I received information from the
Irvine Company Apartment Communities.  The information was
regarding the apartment that Sina BEHESHTAEIN resided in at 3700
Parkview Lane, Apartment 13C, Irvine, California 92612 (Parkwest
Apartments).  I reviewed the Lease Application Agreement for
Parkwest Apartments, as well as other provided records, and
learned the following:

a.   The tenants for this apartment were listed as
Sina BEHESHTAEIN and Setareh BEHESHTAEIN.  Their relationship
was listed as siblings;

b.   The move-in date was listed as April 1, 2017 and
the move-out date as April 26, 2019.  The previous residential
address was listed as 22332 Caminito Tecate, Laguna Hills,
California 92653 and the forwarding address was listed as the
SUBJECT PREMISES;

18

c.   Sina BEHESHTAEIN listed his current employer as
"Ebay," the job type as "Sales," and his estimated annual income
as "$56,000.00."

22.   I conducted record checks in federal indices on the
shipments/importations destined for 3700 Parkview Lane,
Apartment 13C, Irvine, California 92612 during the time that
Sina BEHESHTAEIN resided there.   The record checks revealed that
there were approximately 180 shipments from April 27, 2017 to
April 18, 2019 to this address.   These shipments were consigned
to "Sina," Sina BEHESHTAEIN, or Sima Razavi.   These shipments
arrived from Hong Kong or China and most of these shipments were
declared as spark plugs, ignition electrical component, bearing,
or steel bush.

23.   On August 7, 2019, I received information from PayPal
pertaining to Setareh BEHESHTAEIN's PayPal account information.
I reviewed the information and learned that Setareh BEHESHTAEIN
had four PayPal accounts, one of those accounts was an open
PayPal account, number 1967269777637479314.   I also learned the
following:

a.   This PayPal account was created on December 28,
2014, with the business name of "405Engineering" and an email
address of setarebeheshtaein@yahoo.com;

b.   This PayPal account had the address 3700 Parkview
Lane, Apartment 13C, Irvine, California 92612 listed as the most
recent home or work address;

c.   This PayPal account had a listed total amount received of $70,898.87 and a listed total amount sent of $23,985.17;

d.   I reviewed the payments received to this PayPal account.  There were approximately 2,502 payments received during the date range of August 11, 2017 to July 23, 2019.  Most of these payments were from eBay for automotive parts;

e.   Setareh BEHESHTAEIN's active bank account for this PayPal account was listed as Chase Bank, under account number ending in 6743.

24.   On or about October 24, 2019, SA Wittmier conducted financial analysis on this Chase Bank account number ending in 6743 and advised me that from December 26, 2017 to August 26, 2019, there was approximately $43,022.00 deposited into this account from PayPal.  SA Wittmier also advised me that Setareh BEHESHTAEIN transferred approximately $45,500.00 into Sina BEHESHTAEIN's bank account.

25.   On October 29, 2019, I conducted surveillance at the SUBJECT PREMISES.  I observed the following:

a.   At approximately 9:26 a.m., I observed the garage door open for the SUBJECT PREMISES.  Sina BEHESHTAEIN, who I recognized from his California driver's license picture, drove his red 2014 Nissan Sentra bearing California license plate number 7KML487 outside the garage and parked the vehicle in an unassigned parking spot in front of the SUBJECT PREMISES. During this time, I observed another vehicle parked in the garage.  This vehicle was a black 2015 Hyundai bearing

20

California license plate number 7HDD653 and was registered with the California Department of Motor Vehicles to Sina BEHESHTAEIN.

b.   At approximately 11:30 a.m., I conducted a drive-by of the SUBJECT PREMISES and observed one United States Postal Service ("USPS") bin (plastic mail tub) on the ground in the front of the entry door to the SUBJECT PREMISES.

c.   At approximately 12:05 p.m., I observed a FedEx delivery truck stop in front of the SUBJECT PREMISES.  I observed the FedEx driver make a delivery to the residence. Subsequently, I conducted another drive-by of the SUBJECT PREMISES and at this time observed two USPS bins on the ground in front of the entry door to the SUBJECT PREMISES.

d.   At approximately 12:39 p.m., I observed Sina BEHESHTAEIN exit the SUBJECT PREMISES and enter his red Nissan Sentra vehicle (CA-7KML487).  Sina BEHESHTAEIN departed the location in his vehicle.  I followed Sina BEHESHTAEIN in my vehicle until Sina BEHESHTAEIN proceeded onto the Interstate 5 Highway.

26.  Following the above surveillance, I conducted database queries in DHS indices to gather information pertaining to any importations/shipments into the United States from abroad destined for the SUBJECT PREMISES.  The record checks revealed the following information:

a.   A shipment had arrived from South Korea on October 29, 2019 and was destined for the SUBJECT PREMISES.  The consignee on the shipment was listed as "SINA" at the SUBJECT PREMISES.  The shipment was declared as Steel Bush, contained

21

Case 8:19-mj-00942-DUTY   Document 3   Filed 12/26/19   Page 24 of 47   Page ID #:210
Case 8:19-mj-00942-DUTY *SEALED*   Document 2 *SEALED*   Filed 12/16/19   Page 24 of 47
Page ID #:117

two boxes, and was valued at $366.00, with the Reference Number
2W0R20GLMBK.  The shipment arrived via UPS Express Courier,
Flight Number 99.

      b.   I conducted an open source database check on UPS'
website (https://www.ups.com/track) regarding UPS Shipment
Reference Number 2W0R20GLMBK.  The Tracking Details for this
shipment listed the UPS Tracking Numbers for this shipment as
1Z2W0R200443508787 and 1Z2W0R200444531197 and the shipment
currently in transit.  The scheduled delivery date was listed as
October 30, 2019, the estimated time of delivery as "by end of
day" and the ship to location as Laguna Niguel, California.

    27.  On October 30, 2019, HSI SA Shawn Nelson conducted
surveillance at the SUBJECT PREMISES.  SA Nelson advised me of
the following:

      a.   At approximately 11:00 a.m., SA Nelson observed a
USPS bin on the ground outside the front door to the SUBJECT
PREMISES.

      b.   At approximately 12:24 p.m., SA Nelson observed
the garage door to the SUBJECT PREMISES open.  Sina BEHESHTAEIN
exited the garage at approximately 12:28 p.m. holding a grocery
bag with unidentified contents.  Sina BEHESHTAEIN walked across
the street to his vehicle and returned to the SUBJECT PREMISES
still holding the grocery bag.  At approximately 12:29 p.m.,
Sina BEHESHTAEIN exited the SUBJECT PREMISES without the grocery
bag and again walked across the street.  Sina BEHESHTAEIN
returned to the SUBJECT PREMISES at approximately 12:29 p.m.  At
approximately 12:30 p.m., Sina BEHESHTAEIN again exited the

22

garage holding a grocery bag with unknown contents, he entered a
red four door passenger vehicle and departed the area.

c.   At approximately 2:18 p.m., SA Nelson observed a
UPS truck drive up to and park in front of the SUBJECT PREMISES.
The driver exited the vehicle with a delivery and walked to the
front door of the SUBJECT PREMISES.  The driver returned to the
vehicle and again exited with another delivery.  After dropping
off the second delivery, the driver departed the area.

28.  On November 5, 2019, I conducted an open source
database check in UPS' website (https://www.ups.com/track) on
UPS Tracking Numbers 1Z2W0R200443508787 and 1Z2W0R200444531197.
The Tracking Details for this shipment listed it as a two piece
shipment that was delivered on October 30, 2019 at 2:19 p.m. and
left at the front door.  The weight of this shipment was listed
as 20.50 kilograms.

29.  On October 30, 2019, I conducted surveillance at the
SUBJECT PREMISES after SA Nelson departed the location.  I
observed the following:

a.   At approximately 2:35 p.m., I arrived at the
SUBJECT PREMISES and observed two USPS bins on the ground in
front of the entry door to the SUBJECT PREMISES.

b.   At approximately 2:50 p.m., I observed a Southern
California Gas Company ("SoCalGas") truck arrive and park in
front of the SUBJECT PREMISES.  The SoCalGas worker exited his
truck and went to the front door of the SUBJECT PREMISES.
Subsequently, the SoCalGas worker went to the garage door area.
The garage door opened, and an unidentified older male subject

23

greeted the SoCalGas worker from inside the garage.  The
SoCalGas worker went inside the garage and the garage door
remained open.

        c.  At approximately 3:09 p.m., I conducted
surveillance of the SUBJECT PREMISES on foot.  While standing on
a publicly accessible street, I was able to see into the garage
for the SUBJECT PREMISES.  During my surveillance, I observed
that there were no vehicles parked in the garage at this time
and I saw an older male subject talking to a SoCalGas worker.
Inside of the garage, I saw what appeared to be automotive parts
on shelving units located on the right side of the garage.  I
also saw additional USPS bins stacked on top of each other
located on the left side of the garage.

        30.  On October 30, 2019, I conducted a query on the seller
"parts325" in eBay's website (https://www.ebay.com/usr/parts325)
and observed 260 automotive parts for sale for the eBay seller
"parts325."

        31.  On October 30, 2019, SA Wittmier and I conducted an
undercover buy of the following automotive parts from Setareh
BEHESHTAEIN's eBay store - eBay seller "parts325":

- "1 pc SKF 6205-2RSH C3 rubber seals deep groove ball
  bearing Made in France (283632753113)" (quantity: 1 / item
  price: $5.55);

- "1 pcs SKF 6206-2RS new rubber seals ball bearing free
  shipping Made in France (283637289107)" (quantity: 1 / item
  price: $8.10);

24

- "6 pcs TOYOTA OEM 90919-01210 IRIDIUM long life Spark Plugs DENSO SK20R11 (282793183114)" (quantity: 1 / item price: $33.55);

- "4 PCS OEM 9807B-5615W LASER IRIDIUM Spark Plug DENSO SKJ20DR-M11 3377HONDA ACURA (282793224481)" (quantity: 1 / item price: $22.19);

- "4 PCS NGK IZFR6K-11S OEM NEW 9807B-561BW LASER IRIDIUM Spark plug HONDA CIVIC (282793198248)" (quantity: 1 / item price: $27.08); and

- "6 pcs NGK PLFR5A-11 nissan laser platinum 22401-5M015 Nissan infiniti Oem (282772260166)" (quantity: 1 / item price: $28.05);

32.   On November 4, 2019, HSI SA Steven Timmins and I took custody of three packages from a mailbox, utilized in an undercover capacity, located in the city of Santa Ana, California.   The shipping labels on the three packages all listed the same shipper information: "World_Capital, PO Box 2223, Mission Viejo, CA 92690-0223."

33.   On November 5, 2019, SA Timmins and I conducted an inventory of the contents of the three packages and confirmed that the three packages contained all the items that were purchased from eBay seller "parts325" on October 30, 2019.

34.   On November 6, 2019, I sent, via e-mails, photographs I took of the automotive parts purchased from eBay seller "parts325" to the various trademark rights holders of the automotive parts, including Toyota Motor North America, SKF USA, Inc., Nissan Group of North America, and American Honda Motor

25

Co. Inc., for determination regarding whether the automotive
parts were genuine or counterfeit.  I subsequently received
responses from the trademark rights holders concluding that each
automotive part purchased from eBay seller "parts325" was
counterfeit.

35.  On October 31, 2019, SA Wittmier conducted
surveillance at the SUBJECT PREMISES and observed the following:

a.  At approximately 9:30 a.m., SA Wittmier observed
two USPS bins near the front entry way for the SUBJECT PREMISES.

b.  At approximately 9:35 a.m., SA Wittmier observed
a white male subject, possibly 60-65 years of age, with white
hair and white facial hair (mustache) walk from the front of the
SUBJECT PREMISES to the trash cans located next to the curb in
front of the SUBJECT PREMISES.  The male subject opened the lid
of one of the trash cans, peered into it, and then closed the
lid and walked back into the front of the SUBJECT PREMISES. This
white male subject was later identified as Sina BEHESHTAEIN's
father named Mohsen Beheshtaein.

c.  At approximately 10:00 a.m., SA Wittmier observed
the garage door to the SUBJECT PREMISES open.  The same older
male subject was seen sweeping the garage floor and appeared to
be talking to someone else inside the garage.  The older male
subject then walked back to the trash cans at the curb with a
small white or light grey box in his hand.  The older male
subject opened the trash can lid and pulled out a small red box,
SA Wittmier later identified this box as a Honda spark plug box,
looked at it and then set it back into the trash can.

26

d.    At approximately 10:10 a.m., SA Wittmier observed
Sina BEHESHTAEIN sitting at a table or work bench inside the
garage.  SA Wittmier could see a silver laptop computer on the
work bench and what appeared to be a USPS box under the table.

e.    At approximately 10:50 a.m., SA Wittmier
retrieved the small red box from Sina BEHESHTAEIN's trash can
which was a Honda spark plug box.  SA Wittmier also located two
additional Honda spark plug boxes and one Toyota spark plug box
inside the trash can.  SA Wittmier retained these boxes.

36.  On November 1, 2019, SA Wittmier sent photographs that
he took of this Toyota spark plug box and Honda spark plug boxes
to Toyota Motor North America and American Honda Motor Co. Inc.
for determination regarding whether the empty spark plug boxes
were genuine or counterfeit.  The following day, Toyota advised
SA Wittmier and me that the Toyota spark plug box was suspected
to be not genuine since the alignment and spacing of the text
and the font of the text on the suspect box were inconsistent
with the genuine sample box.  On November 4, 2019, Honda advised
SA Wittmier and me that the Honda spark plug boxes were not
genuine based on several factors, including "improper font/image
spacing and alignment all throughout the packages" and the part
number on the box no longer being an active part number.

37.  On November 7, 2019, I reviewed information received
from Postal Inspector ("PI") Christine Reins-Jarin of the U.S.
Postal Inspection Service regarding the SUBJECT PREMISES.  I
learned that on November 5, 2019, PI Reins-Jarin interviewed
Letter Carrier Tony Huynh at the Laguna Beach Main Post Office

27

regarding the SUBJECT PREMISES.  Mr. Huynh stated that he

recognized the address of the SUBJECT PREMISES and he believed

the family at the address has been there one to two years.  Mr.

Huynh indicated that the customer at the SUBJECT PREMISES sells

things and has outgoing parcels for him to pick up at the house

almost every day.  Mr. Huynh said the customer usually has a few

tubs of outgoing items. Mr. Huynh said he once asked the

customer what he was selling, because sometimes the packages are

heavy, and Mr. Huynh said the customer told him the packages

contained ball bearings.  Finally Mr. Huynh said he has seen car

parts in the garage and mentioned seeing Toyota items.

38.  On November 13, 2019, I conducted an Internet based

search of the California Secretary of State, Business Programs

(https://businesssearch.sos.ca.gov/) regarding World Capital

LLC.  The business search revealed the following information:

a.   Sina BEHESHTAEIN registered/electronically filed

World Capital LLC with the California Secretary of State on

January 1, 2019.  At the time of the registration, Sina

BEHESHTAEIN listed the business address at 3700 Parkview Lane,

Apartment 13C, Irvine, California 92612;

b.   On June 5, 2019, Sina BEHESHTAEIN filed a

Statement of Information with the California Secretary of State

in which he changed his business address to the SUBJECT

PREMISES.  Sina BEHESHTAEIN listed himself as the "CEO" for

World Capital LLC;

28

c.   The status for the business was listed as active and the type of business for World Capital LLC was listed as "online sales and investment."

39.   On November 26, 2019, I again conducted a query of "405parts" in eBay's website (https://www.ebay.com/usr/405parts) and observed 356 items for sale.  The 356 listed items for sale were all automotive parts and some of the items were similar to the ones that were found to be counterfeit in the undercover purchases from eBay seller "405parts" described above.

40.   On November 26, 2019, I again conducted a query of "parts325" in eBay's website (https://www.ebay.com/usr/parts325) and observed 275 items for sale.  The 275 listed items for sale were all automotive parts and some of the items were similar to the ones that were found to be counterfeit in the undercover purchases from eBay seller "parts325" described above.

41.   On November 26, 2019, SA Nelson conducted surveillance at the SUBJECT PREMISES.  At approximately 12:26 p.m., SA Nelson observed one USPS bin on the ground outside the front door to the SUBJECT PREMISES.  At approximately 1:01 p.m., SA Nelson observed two USPS bins on the ground outside the front door to the SUBJECT PREMISES.

## V.   ADDITIONAL TRAINING AND EXPERIENCE REGARDING COUNTERFEIT MERCHANDISE

42.   Based on my training and experience and from conversations with other agents, I know the following:

a.   False shipping labels are sometimes used when smuggling items in an attempt to avoid detection by customs

29

inspections.  Alias names and addresses are sometimes used by individuals who purchase counterfeit merchandise from abroad. This is done in an attempt to circumvent normal customs inspections or in an attempt to thwart authorities investigating such violations.

b.    Wholesale and retail distributors of counterfeit merchandise often acquire counterfeit packaging to suggest that the contraband is, in fact, authentic.  This allows them to charge more for the counterfeit merchandise and to fool unsuspecting customers who rely on the packaging to believe the merchandise is authentic.

c.    Individuals who import counterfeit merchandise often possess documents related to importation, such as U.S. Customs entry forms 3461 (entry form for immediate delivery) and 7501 (entry summary), Entry Summaries, U.S. Customs Manifests of Goods, U.S. Customs declaration forms, invoices, bills of lading, air way bills, purchase orders, general ledgers, subsidiary ledgers, packing slips, and air bills.

d.    Wholesale and retail distributors of counterfeit merchandise often acquire records, documents, programs, and materials that consist of correspondence, memos, video and audiotapes, facsimiles, and electronic mail relating to counterfeit merchandise and records, documents, programs, and materials that consist of customer lists and address books containing information relating to the shipment, importation, exportation, purchase, manufacture, sale, distribution, or storage of counterfeit merchandise.  The shipment, importation,

exportation, purchase, manufacture, sale, distribution of
counterfeit merchandise are sometimes kept on "digital devices"
or in off-site locations such as in storage units.

### VI.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES[4]

43.   Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

---

[4]As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
paging devices, mobile telephones, and smart phones; digital
cameras; gaming consoles; peripheral input/output devices, such
as keyboards, printers, scanners, monitors, and drives; related
communications devices, such as modems, routers, cables, and
connections; storage media; and security devices.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

44.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.   Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.   Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.   As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

45.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.   To use this function, a user generally displays a physical feature, such as a fingerprint, face, or

eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   For these reasons, if while executing the warrant, law enforcement personnel encounter a digital device that may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) compel the use of Sina BEHESHTAEIN's and/or Setareh BEHESHTAEIN's thumb- and/or fingerprints on the device(s); and (2) hold the device(s) in front of the face of any of those persons with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

34

46.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VII. <u>NON-LAW-ENFORCEMENT PERSONNEL TO ASSIST WITH SEARCH</u>

47.   Pursuant to 18 U.S.C. § 3105, HSI intends to have representatives of Honda, Toyota, and SKF present during the requested search in order to assist law enforcement in the identification of counterfeit Honda, Toyota, and SKF parts.

### VIII.      <u>CONCLUSION</u>

48.   Based on the above, I believe that there is probable cause to permit the search of the SUBJECT PREMISES as described in Attachment A and there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of the Subject Offenses will be found at the SUBJECT PREMISES.


_____
                /s/
Olga Sagalovich, Special Agent
Homeland Security Investigations



Subscribed to and sworn before me this __16__ day of December, 2019.

*Karen E. Scott*

HONORABLE KAREN E. SCOTT
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

The SUBJECT PREMISES is located at 28291 Via Luis, Laguna
Niguel, California 92677 and includes the residential building,
garage, and any appurtenances thereto.  The SUBJECT PREMISES is a
two-story attached condominium, tan in color with brown trim, and a
red Spanish style tiled roof.  The garage is attached to the lower
floor of the condominium and faces the roadway of the condominium
project.  The numbers 28291 are on the exterior of the building to
the right side of the garage door and are black in color over a white
background.  The entry-door to the SUBJECT PREMISES is situated
behind a black rod iron fence.

**ATTACHMENT B**

I.   <u>ITEMS TO BE SEIZED</u>

1.   All fruits, evidence, and instrumentalities of
violations of 18 U.S.C. § 2320 (Trafficking in Counterfeit
Goods); 18 U.S.C. § 545 (Smuggling Goods into the United
States); 18 U.S.C. § 1341 (Mail Fraud); and 18 U.S.C. § 1343
(Wire Fraud) (the "Subject Offenses"), namely:

a.   Automotive parts and components bearing
counterfeit trademarks, including but not limited to Honda,
Toyota, and SKF, as well as related packaging, containers,
labels, labeling, and literature;

b.   Records, documents, programs, applications or
materials relating to the importation, acquisition, possession,
purchase, manufacture, sale, shipment, handling, use, or
distribution of any products bearing counterfeit trademarks,
including any such records relating to the importation or
shipment of such goods;

c.   Records, documents, programs, applications or
materials relating to the sale of or adverting of automotive
parts, such as parts advertised as OEM or otherwise suggested to
be genuine consumer automotive brand-name parts;

d.   Records, documents, programs, applications or
materials relating to the operation or establishment of
World_Capital (World Capital), World Capital LLC, 405
Engineering (405engineering), 405parts, 405Part Exchange, and
parts325.

1

Case 8:19-mj-00942-DUTY   Document 3   Filed 12/26/19   Page 40 of 47   Page ID #:226
Case 8:19-mj-00942-DUTY *SEALED*   Document 2 *SEALED*   Filed 12/16/19   Page 40 of 47
Page ID #:133

   e. Records, documents, programs, applications or materials relating to the sale of automotive parts on Ebay and/or PayPal.

   f. Indicia of occupancy, residency, and/or ownership of the SUBJECT PREMISES including utility and telephone bills, canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, envelopes, registration, receipts, and keys which tend to show the identities of the occupants, residents, and/or owners, not to exceed fifteen items;

   g. Any records, documents, programs, applications, and materials consisting of or relating to communications with any representatives of consumer automotive manufacturers that are located domestically or abroad;

   h. Assets, and evidence of assets, derived from or used in connection with trafficking in counterfeit goods (including in connection with the promotion of the carrying on of that activity), such as United States and foreign currency (that is, U.S. currency or U.S. currency equivalent in excess of U.S. $500, including the first $500 if more than $500 is recovered), negotiable instruments, financial instruments, books, receipts, bank statements and bank records, money drafts, money orders and cashiers' checks, receipts, check registers, and bank checks;

   i. Records, documents, programs, applications, and materials relating to the processing, secreting, transfer,

concealment, or expenditure of any proceeds derived from or used in connection with trafficking in counterfeit goods;

     j.   Records, documents, programs, applications, and materials reflecting or relating to the identity or location of others involved in the Subject Offenses, such as photographs, travel records, or communications;

     k.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

     l.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

        i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

        ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

        iii. evidence of the attachment of other devices;

        iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

3

v.    evidence of the times the device was used;

vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.    records of or information about Internet Protocol addresses used by the device;

ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony

PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices.

II.  <b>SEARCH PROCEDURE FOR DIGITAL DEVICES</b>

4.   In searching digital devices or forensic copies
thereof, law enforcement personnel executing this search warrant
will employ the following procedure:

a.   Law enforcement personnel or other individuals
assisting law enforcement personnel (the "search team") will, in
their discretion, either search the digital device(s) on-site or
seize and transport the device(s) and/or forensic image(s)
thereof to an appropriate law enforcement laboratory or similar
facility to be searched at that location.  The search team shall
complete the search as soon as is practicable but not to exceed
120 days from the date of execution of the warrant.  The
government will not search the digital device(s) and/or forensic
image(s) thereof beyond this 120-day period without obtaining an
extension of time order from the Court.

b.   The search team will conduct the search only by
using search protocols specifically chosen to identify only the
specific items to be seized under this warrant.

5

    i. The search team may subject all of the data
contained in each digital device capable of containing any of
the items to be seized to the search protocols to determine
whether the device and any data thereon falls within the list of
items to be seized.  The search team may also search for and
attempt to recover deleted, "hidden," or encrypted data to
determine, pursuant to the search protocols, whether the data
falls within the list of items to be seized.

    ii. The search team may use tools to exclude
normal operating system files and standard third-party software
that do not need to be searched.

    iii. The search team may use forensic examination
and searching tools, such as "EnCase" and "FTK" (Forensic Tool
Kit), which tools may use hashing and other sophisticated
techniques.

    c. If the search team, while searching a digital
device, encounters immediately apparent contraband or other
evidence of a crime outside the scope of the items to be seized,
the team shall immediately discontinue its search of that device
pending further order of the Court and shall make and retain
notes detailing how the contraband or other evidence of a crime
was encountered, including how it was immediately apparent
contraband or evidence of a crime.

    d. If the search determines that a digital device
does not contain any data falling within the list of items to be
seized, the government will, as soon as is practicable, return
the device and delete or destroy all forensic copies thereof.

6

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   This warrant authorizes a review of electronic storage media seized, electronically stored information, communications, other records and information seized, copied or disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of

7

this electronic data may be conducted by any government
personnel assisting in the investigation, who may include, in
addition to law enforcement officers and agents, attorneys for
the government, attorney support staff, and technical experts.
Pursuant to this warrant, the investigating agency may deliver a
complete copy of the seized, copied, or disclosed electronic
data to the custody and control of attorneys for the government
and their support staff for their independent review.

      6.   In order to search for data capable of being read or
interpreted by a digital device, law enforcement personnel are
authorized to seize the following items:

         a.   Any digital device capable of being used to
commit, further, or store evidence of the offense(s) listed
above;

         b.   Any equipment used to facilitate the
transmission, creation, display, encoding, or storage of digital
data;

         c.   Any magnetic, electronic, or optical storage
device capable of storing digital data;

         d.   Any documentation, operating logs, or reference
manuals regarding the operation of the digital device or
software used in the digital device;

         e.   Any applications, utility programs, compilers,
interpreters, or other software used to facilitate direct or
indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

7.    During the execution of this search warrant, law enforcement personnel are authorized to: (1) depress the thumb- and/or fingers of Sina BEHESHTAEIN and Setareh BEHESHTAEIN onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the face of any of those persons with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

9